In the first clause of this testator’s will, he authorizes his wife to lend any part of the property before given her (in effect, his whole estate in Virginia) to such of his children as she should think proper, but if she should lend any part to any of them, the part so loaned should at her decease be returned, in order to make fair and equal division as he should thereafter direct. It was his children, then, for whom he meant to provide; it was among his children that he meant afterwards to direct a fair and equal division.
Then, consider the situation of his family and the relation of the several legatees to him. Of his own five children to whom he bequeathed shares of his residuary estate, his son James had four children living at his death; his daughter Mary, seven; his daughter Patsey, nine; his daughter Nancy, five; and his daughter Narcissa, seven : these five children had, then, thirty-two children ; and they all might, and some probably would (as two of them in fact did) have more issue. Of his children to whose children he bequeathed shares of the same residuary estate, his son Bedford was dead leaving three children ; his son George had four; his daughter Elizabeth, seven : and his daughter Obedience, three; in all eighteen children living at the testator’s death; and George, Elizabeth and Obedience, might and probably would have (as two of them in fact had) more issue born during his widow’s life, who would be letn in *for shares of the same fund. “The intention which the court is asked to impute to the testator, is, that he meant to give to each of his own five children, to aid them in the maintenance of their thirty-two chil *913 dren already in existence, and all the children they should afterwards have, exactly the same portion of his estate, as he gave to each of his eighteen grandchildren, then born, and to each which should be after-wards born, of his other four children. To impute such an intention to the testator, were to violate all probability, and all sense of parental justice by which the testator may fairly be presumed to have been actuated in disposing of his property among his offspring. The estate to be divided was only some 14,600 dollars; and dividing it per capita, there will be thirty-one parts or shares; of which each of the testator’s five children legatees (for themselves and their thirty-two children, and still increasing families) will take one share, and each of his twenty-six grandchildren legatees will take one share. A division per capita, professing to rest on the principle of equality, will perpetrate the grossest and most cruel inequality. If the law imperiously commands this, the law', though common sense revolt at it, must be obeyed. But, happily, there is no such arbitrary rule of law, applicable alike to all testamentary dispositions of the kind ; applicable as well where it W'orks plainly contrary to, as where it may conform with, the testator’s apparent intention.
The cases cited for the appellants, it must be confessed, seem very strong. But in Blackler v. Webb, it does not appear, how many children the testator’s son James and his daughters Mrs. Traverse and Mrs. Mann, respectively, had, or whether they had any, or how many his daughter Mrs. Webb had, or his son Peter left. Por aught that appears in the reported state of the case, Peter might have left some three or four, Mrs. Webb might have had two, and James, Mrs. Traverse and Mrs. Mann none. Suppose it had appeared, that James, *Mrs. Traverse and Mrs. Mann, had, living at the testator’s death, numerous families, some twenty children in all, and that Peter had left, and Mrs. Webb had, some twelve between them; the case would then have been like this; and the like question would have arisen, which arises here, whether it was possible to imagine, that the testator, without any assignable motive, intended to give to his own three children, to enable them to rear and support their numerous families, exactly the same portion which he gave to each of his grandchildren by his son Peter and daughter Mrs. Webb?
In Horridge v. Ferguson, the bequest was to and among ‘‘such of the children of Thomas, Mary, William, Elizabeth and James Henley as should be born in wedlock and living at the decease of the testatrix, or the issue of such of them as should be married.” If the bequest had been to the issue of such of them as should be dead, the court would have had no doubt, that the issue of such as were dead should take per stirpes, instead of the deceased parents. But the court thought that it was too much to interpret “the issue of such as were married,” to mean “the issue of such as were dead:” that, according to the strict grammatical meaning of the words, the issue were to take instead of their parents, in some event not expressed; which would render the bequest uncertain. Yet the testatrix intended that the issue were to take f and to let them in, it was necessary to construe the word or to mean and. If the word or was taken in its literal sense, such of the children as were married and living at the testatrix’s death, would have been cut out entirely. It was necessary, either to understand the word or to mean and, or the word married to mean dead: and the court preferred the former alternative, and then it was clear the issue came in per capita. The court said, “by understanding the word or grammatically, you cannot make sense of the passage without inserting something else; *but by using that latitude of construction which the court has been in the habit of resorting to, and converting it into and, the whole is made consistent, and all the members of the family are let in.” Besides, it seems, the testatrix there was not providing for her own family, and was under no moral duty to have regard to the situation of the legatees in dispensing her bounty among them: she was not providing for Thomas, Marj', William, Elizabeth and James Henley, or for any of them, but for the children and other offspring of them all.
All the English cases that have been cited, are open to similar commentaries. And in respect to them all, it will be found, on examination, that the courts have by no means designed to lay down any fixed inflexible rule of construction, but have adopted that construction, which, upon the circumstances, appeared most just.*
In Tucker &c. v. Tucker’s ex’ors, the bequest was of a fund “to be equally divided between Robert Tucker, John Tucker, John Cooke, Robert Cooke” [nephews of the testator] “and Walker’s children” [children of his niece] ; “and in case Walker’s children should die before they came of age, then their parts to go to the survivor.” The general court’ decreed, that Walker’s four children should take one fifth part per stirpem. “But note this,” says Barradall, “the decree was reversed upon an appeal, and chiefly, as I have been informed, by reason of the word parts in the limitation over to the survivor of Walker’s children.” Mr. Robinson thinks, that the reason for the reversal is to be found in the authority of Blackler v. Webb. It may have been so: but Barradall was likely to be well informed : he himself argued the cause in the general court; and Mr. Jefferson says, he was one “of the most eminent of the ^counsel at that bar. ” † And the reason on which Barradall was informed the reversal was chiefly grounded, seems a *914 natural and sufficient one: the language of the limitation over shewed that Walker’s children were not to take collectively one part, but “parts” (in the plural), and if more than one, then certainly four parts.
Crow v. Crow is certainly not a decisive authority for the appellants. The testator there bequeathed: “The balance of my slaves shall be equally divided among my children, to wit, the heirs of William Crow, namely, William, Robert, Patsey, Nancy, Henry, Ennis and John (heirs of William Crow deceased), Thomas, Moses, and John Crow, and the children of my deceased daughter Massey Jones, and the children of my deceased daughter Sarah Crane; but the children of my daughter Jones are to take only such part as their mother would take if she was alive, that is to say, a child’s part, and in like manner the children of my daughter Crane are to take only such part as their mother would take if she was alive, that is to say, a child’s part.” The question was, whether the seven children of the testator’s deceased son William, should take collectively one part among them, or take per capita seven out of twelve parts? The county court and the chancellor held, that they should take per stirpes; this court that they should take per capita; Green, J., dissenting. The case of Bladder v. Webb, and other English cases of the same class, were indeed cited, and the general' principle they proceeded upon, stated and approved. Yet this court did not rest its decree, merely or mainly, upon the authority of those cases, but rather on the particular provisions of the will before them: namely, that the testator mentioned the seven children of his son William by name, as his own Children ; and then (which was the most influential consideration) he expressly provided, that the children of his daughter Mrs. Jones, and those of his daughter Mrs. Crane, respectively, should take per stirpes, but did not provide, that the children of his son William should likewise take per stirpes; whence the court inferred the intention, that William’s children should take per capita. And it was on this peculiar circumstance in that case, that the decision was mainly founded. There is nothing like it in our case.
It is to be remarked, that in all the cases which have been referred to, the bequest was to take effect immediately on the testator’s death, when all the legatees named, or described by classes, would be ascertained, and the aliquot parts they were each to take, would of course be also ascertained. But in this case, the division of the fund was postponed till the death or marriage of the testator’s widow: his five children named legatees were known, and they were to have their aliquot parts, without regard to their numerous families, or any future increase thereof; but his four children’s children who were to take as legatees, could not be known till the widow’s death. Upon the principle of a division per capita, the aliquot parts of the testator’s own children would be liable to continual diminution, and .the.aggregate shares of each of three sets of. the grandchildren legatees, would be continually increasing. The testator could not have intended to give his five children such small portions of his estate, and even those small portions subject to eventual and probably great diminution.
Evidence was adduced, by the appellants (it seems), of the value of the lands which had been advanced by the testator, in his lifetime, to his sons James and George, and of the value of the lands devised to his son James, to his two grandsons D. and S. Major, and to his two grandsons Thomas and James Hamlett. If the object for which this evidence was adduced, was, to shew a *reason why the testator should make a greater provision for the several sets of grandchildren legatees, than for the children legatees, it is nothing to the purpose. Eor though land was advanced and land devised to the son James, no land was advanced or devised to the daughters Mary, Patsey, Nancy and Narcissa, who are certainly to take an equal share with James, of the residuary estate, whatever that share may be; land had been advanced to George, yet George’s children born and to be born before the widow’s death, were to have a share or shares of the residuum; and lands were devised to two sons of the testator’s son Bedford, and to two sons of his daughter Obedience, and yet they are made legatees of the residuum, along with the other child of Bedford and the other children of Obedience.
Evidence, too, was adduced by the appellants to shew that the testator’s five children legatees, were all in easy circumstances, whereas, of the children whose children were made legatees, Bedford had died insolvent; George was living, and was needy and improvident; the husband of his daughter Averett was also needy and improvident ; and the husband of his daughter Obedience, though industrious and provident, was supposed to be embarrassed: and the purpose of this evidence was, apparently, to assign a motive which might have induced the testator to make a more liberal provision for the four needy branches of his family, than for the five who were well to do in the world; to give to his children legatees a pittance (a pittance, having regard to their numerous and probably increasing families) and to give the same bounty to each of the children of his other four children, which, as to them, was comparatively a large provision. The circumstance may indeed explain the reason why the testator bequeathed portions of his estate to five of his children, and other portions to his grandchildren instead of their parents; but it shews no motive for making a more liberal provision for the latter than for the former. He gave portions of his estate to *his five children, because they would probably improve his bounty to-the advantage of their families: he gave other portions to the children of his other children, because, if he gave them to their parents, they might probably be wasted by those that were both needy and improvident, and applied to the payment of the debts of those who were embarrassed ; so that neither they nor their families would enjoy his bounty. If all his children, or their husbands, had been equally provident and equally unembar *915 rassed, he would have given his estate in equal portions to his nine children; if all had been equally improvident and wasteful, or equally embarrassed with debt, he would have given his estate to the children of them all. A consideration of the situation of the several branches of the testator’s family, affords a strong argument that the decree of the circuit superior court conforms with the testator’s real intention, and is right.
The President announced the unanimous opinion of the court, that the decree should be affirmed, but the reasons of the opinion were not stated.*
Decree affirmed.

The counsel went Into a critical examination of the whole class of cases ; hut it is not necessary to report their comments on them all. — Note in Original Edition.

See preface to Jeiferson’s reports. That small volume contains Barradall’s reports of cases which depended on our own colonial laws, hut not oi the cases which depended on questions of law or equity common to both the mother country and the colony. Therefore, Mr. Jefferson has not included the case of Tucker &c. v. Tucker’s ex’ors. — Note in Original Edition.

The decree was pronounced at a very late day of the term. The president told the reporter, that a written opinion had been prepared, which was mislaid. It has never been found. Considering- the interesting question involved, its doubtfulness, and the weight and apparent application of the authority of Blackler v. Webb and the other cases of that class, it is much tobe regretted, that the reasons of the decision of the court are lost to the profession. The reporter learned, in conversation with the judges, that, upon the particular circumstances, they thought this testator intended a division of the subject among the legatees per stirpes, and that there was nothing in the authorities which required the court to disregard the intention in this case more than in any other cases of testamentary disposition. He inferred, that the court saw reasons to distinguish this case from those of Blackler v. Webb, Crow v. Crow, &c. not to deny, or shake, the authority of those adjudications. — Note in Original Edition.